# In the United States Court of Federal Claims

No. 22-18
Filed: April 14, 2022
Reissued: May 3, 2022[†]

**THE GINN GROUP, INC.,**

***Plaintiff,***

**v.**

**THE UNITED STATES,**

***Defendant,***

**and**

**GOVERNMENT CONTRACTING RESOURCES, INC.,**

***Intervenor-Defendant.***

*Nathanael D. Hartland* and *Courtney E. Walsh*, Nelson Mullins Riley & Scarborough LLP, Baltimore, Maryland, for Plaintiff.

*Elizabeth M.D. Pullin*, Trial Attorney, *Douglas K. Mickle*, Assistant Director, *Patricia M. McCarthy*, Director, Commercial Litigation Branch, *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Civil Division, U.S. Department of Justice, Washington, D.C., with *Robert Greg Palmer* and *Luke F. Killam*, Associate Counsel for U.S. Navy, of counsel, for Defendant.

*Meghan F. Leemon*, PilieroMazza PLLC, Washington, D.C., for Intervenor-Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

The United States Department of Navy ("the Agency" or "the Navy") awarded Government Contracting Resources, Inc. ("GCR") a contract (over five other offerors) to provide base operations support services at two U.S. Navy facilities in Florida. The disappointed offeror,

[†] This Opinion was filed under seal on April 14, 2022. On April 29, 2022, the parties filed a joint status report proposing redactions of protected information. (ECF No. 44). This public version reflects those redactions.

the Ginn Group, proposed expanding one subset of the services requested: recycling services. When the Agency did not assign a strength to Ginn Group's proposal for that technical approach, and more importantly, when it did not view this additional investment as worthy of the higher price tag, Ginn Group challenged the award. The Court finds that the Agency's determinations fell squarely within the zone of reasonable decisions in reviewing and deciding awards in the context of negotiated, best-value procurements. In this case, the Agency's best-value determination—particularly when reviewed in the context of the layers of deference owed to it—did not lack a rational basis.

Accordingly, the Court **DENIES** Ginn Group's Motion for Judgment on the Administrative Record and **GRANTS** the United States' and the Government Contracting Resources, Inc.'s cross-motions for judgment on the Administrative Record.

## I. Background[1]

The Navy sought to procure base operation support services at Naval Air Station in Panama City, Florida, and the surrounding areas, including Naval Operations Support Center at Tallahassee, Florida.[2] The Navy conducted market research and selected service-disabled, veteran-owned, small businesses ("SDVOSB") set-aside as part of its acquisition strategy. (AR 9). Six offerors applied. (AR 6157).

The solicitation called for a single, indefinite delivery, indefinite-quantity contract. (Def.'s xMJAR at 10, ECF No. 36). The request for proposal ("RFP") anticipated that the resulting contract would have a 12-month base period and seven 1-year option periods, and another pair of 6-month option periods should an extension of services be necessary under FAR 52.217-8 (spanning from October of 2021 to March 2030). (AR 27–28). The contract contemplates an eight-year ordering period and is valued at $54,929,956.73. (AR 8123, 8189). The Navy evaluated six offerors on both price and non-price factors, among them Ginn Group and GCR. (AR 6330).

The Navy evaluated offerors' proposals for performing the following services: (1) Facility Management; (2) Facility Investment; (3) Custodial; (4) Pest Control; (5) Integrated Solid Waste Management ("ISWM"); (6) Other (Swimming Pools); (7) Grounds Maintenance and Landscaping; (8) Pavement Clearance; and (9) Environmental.[3] The solicitation described

---

[1] The facts recited in this Memorandum Opinion and Order are taken from the Administrative Record ("AR") (ECF No. 24); Ginn Group's memorandum in support of its Motion for Judgment upon the Administrative Record ("Pl.'s MJAR"),(ECF No. 33); and the United States' and GCR's respective Cross-Motions for Judgment upon the Administrative Record ("Def.'s xMJAR" and "Def.-Int.'s xMJAR"),(ECF Nos. 36, 37).

[2] RFP N6945021R0056 consolidated two previous contracts, Contract No N69450-16-D-2104 (awarded to Ginn Group in 2016) and Contract No 69450-17-D-1707 (awarded to GCR in 2017). (AR 1–9, Market Research Report, and AR 10–16).

[3] The Navy referred to these services as sub-annexes, in line with how they appeared in the PWS all under one annex titled "Annex 15 Facilities Support." (AR 188).

each of these services as sub-annexes. (AR 188). A Performance Work Statement ("PWS") accompanied the RFP which further outlined the performance objectives for each sub-annex. (AR 188). For example, the PWS further broke down the ISWM sub-annex into various subtasks, or "Spec Items," that included collection, disposal, or recycling of different types of waste. (AR 167–69).

The solicitation provided that the award would be made to the offeror whose proposal presented the best value to the Government. (AR 27). The best-value determination involved assessment of proposals against the criteria in the solicitation to determine which proposal would be overall "most advantageous" to the Government. (AR 55). This best-value evaluation involved considering price and four non-price factors: (1) corporate experience, (2) technical approach, (3) safety, and (4) past performance. (AR 46–47). Under the best-value evaluation criteria, corporate experience, technical approach, and safety were all of equal importance to each other, and, when combined, were equal in importance to past performance. (*Id.*). Furthermore, all of the above non-price factors, when combined, were weighted "approximately equal" to price. (*Id.*)

The initial assessment of the proposals was divided into two areas—a Price Team and a Technical Evaluation Team ("Technical Team"). Both teams met separately to evaluate the proposals for those respective elements. (AR 6344–75, 8086–8102). The Source Selection Evaluation Board ("SSEB") convened to evaluate those findings and issue its own report. (AR 6344–75, 8086–8102).

To be evaluated for their technical approach, offerors submitted proposed labor hours and provided a rationale for the basis of their estimated proposed labor hours by completing a labor hours worksheet. (AR 142). Offerors were asked to provide a "narrative" justification explaining the foundation of their estimates and demonstrate how the proposed approach would translate into achieving performance objectives. (*Id.*). The RFP stated that omitting the total efforts of either category or providing labor hours without a logical explanation of how they would achieve that staffing level would lead to the proposal being evaluated as "less favorable" or "unacceptable." (AR 142). To properly assess the total labor hours offered by each offeror, the Technical Team referenced two estimates—one based on a mixture of the mean labor hours proposed by all offerors for each sub-annex of work and one a formal Independent Government Estimate ("IGE"). (AR 5841). The Technical Team used the following methodology for rating technical approaches: if proposed labor hours (for any sub-annex or Spec Item) fell short of the labor hours anticipated by the Government by more than 25%, the offeror received a deficiency mark for that section. However, if the sub-annex in question was "non-critical" or the difference was "nominal," the Technical Team would only give "[c]onsideration" for assigning "weakness, significant weakness, or deficiency." (AR 8031).

In evaluating each proposal's technical approach, the Technical Team assigned adjectival ratings (Outstanding, Good, Acceptable, Marginal, or Unacceptable), where each adjective corresponded with a descriptive statement that captured both the adequacy of the proposed technique and its associated risks. (AR 25–67). For example, an "Outstanding" rating was defined as one that "indicates an exceptional approach and understanding of the requirements and contains multiple strengths" and where the "risk of unsuccessful performance is low." (AR 43). These ratings referenced terms such as weaknesses, significant weaknesses, and

deficiencies, and the RFP in turn defined those terms. (*Id.*). For example, strength was defined as "[a]n aspect of an offeror's proposal that has merit or exceeds specified performance or capability requirements in a way that will be advantageous to the Government during contract performance." (*Id.*).

The Price Team also conducted a price analysis of all offers by comparing the proposed prices to both the IGE and the median established by the proposals. (AR 6159). The Price Team rated Ginn Group as third in price position and GCR as first.[4]

After the Technical Team and the Price Team's first evaluations, the SSEB reviewed each team's findings independently and discussed its findings in a separate report. (AR 6344–6375, 8086–8102). The SSEB concluded that all offerors were un-awardable for at least one reason and recommended discussions with all six offerors to address shortcomings. (AR 6375). Both Ginn Group and GCR had received an overall rating of "Unacceptable" and both received an "Unacceptable" rating for their Technical Approaches. (AR 6348). Both offerors' proposals were also marked as significantly weak or deficient due to understaffing in certain sub-annexes. (AR 5842, 5861–68, 5878–84). With each of these, the SSEB asked the offerors to "review and confirm, or revise" their labor hours and to modify their narrative explanations to demonstrate to the Agency that the labor hours proposed were adequate. (AR 6415–16, 6392–6393).

After this the Agency received Final Proposal Revisions ("FRPs") from all six offerors, the Technical Team re-evaluated the final proposals and revised all offerors' ratings. (AR 8030). In particular, the Technical Team found Ginn Group's answers to the questions raised during the first stage to be satisfactory and eliminated Ginn Group's deficiency and significant weakness rating for its technical approach. (AR 8068–69). After the final review, the Ginn Group's overall evaluation on the Technical Approach was "Good" with one strength, no weaknesses, significant weaknesses, or deficiencies. (AR 8069). In at least one subset of the technical approach, the reliability center maintenance program, Ginn Group received a strength rating. (*Id.*). The Agency eliminated the deficiency and significant weakness marks from the first evaluation of GCR's proposal after reviewing GCR's responses to the discussion questions. (AR 8053–54). GCR's overall evaluation on technical approach was "Acceptable" with no strengths, weaknesses, significant weaknesses, or deficiencies. (*Id.*).

The Technical Team found that one category of the revised labor hours proposed by Ginn Group (labor hours for Management and Administration services or Spec Items 1&2) fell short of the Government's estimate by approximately ■%. (AR 8068). The Agency noted that because the proposed hours were only approximately ■ full time equivalent ("FTE") less than the Government estimate, the proposed hours were not "significantly lower" than the estimate. (*Id.*).[5] The Technical Team also noted that GCR's revised labor hours for two sub-annexes,

---

[4] GCR's price was ■% below the IGE and ■% below the median of all offerors, whereas Ginn Group's price was ■% below the IGE and ■% below the median of all offerors. (AR 6348).

[5] The Government's estimated hours, ■, subtracted by the Ginn Group reported hours, ■, was ■ which is slightly less than the standard FTE of 2,080. (AR 8068).

Facility Management and Custodial, were lower than the Government's estimate; however, because the proposed hours "were less than ██ FTE lower" than expected, and only approximately █% "over the range" acceptable by the Government, this difference was viewed as "nominal." (AR 8053).

Both Ginn Group's and GCR's revised offers were evaluated again for price. (AR 8140). The Price Team found Ginn Group's proposed price to be the third lowest-priced among other offerors and GCR's proposed price to be the lowest-priced offer. (AR 8160–62, 8149–51). Ginn Group's overall proposed price was ████% lower than the IGE and ███% lower when compared to the median price of all offerors. (AR 8160). GCR's overall proposed price was ████% lower than the IGE and ████% lower than the median proposed price. (AR 8149).

The SSEB reconvened and re-evaluated all offers based on price and non-price factors again. (AR 8090). The SSEB found that the Technical Team and the Price Team had followed the criteria in the RFP and found that the assigned ratings were supported by the evaluation and findings. (*Id.*; Def.'s xMJAR at 30). After providing a comparative analysis of all final ratings and accounted for the relative importance of each four factors, the SSEB recommended that GCR's proposal represented the best-value and was the most advantageous to the Government. (AR 8099–8102). The SSEB noted that Ginn Group's proposal was rated "Good" overall on non-price factors, with an "Acceptable" or "Satisfactory" Confidence rating for Past Performance, whereas GCR's proposal was rated as "Acceptable" on non-price factors with an "Acceptable" or "Satisfactory" Confidence rating for Past Performance. (AR 8099–8100). However, after noting that Ginn Group only offered the third lowest price, the SSEB stated that the "factor-by-factor review" of all proposals indicated that there was "no benefit to trade-off to the higher priced offeror, as [they] did not present non-price advantages to the Government that would merit the additional cost of selecting" those proposals. (AR 8102).

At the final stage, the Source Selection Authority ("SSA") considered the lengthy SSEB report which included comparative analysis of all offerors' final proposals. (AR 8121). The SSA, acting independently, determined that GCR's offer represented the best value to the Government. (*Id.*). The SSA distinctly addressed the comparison with Ginn Group, stating that although Ginn Group received a better technical rating than GCR, GCR maintained a comparative advantage in Corporate Experience and Past Performance (AR 8122–23). The SSA therefore also independently found that the non-price advantages in Ginn Group's proposal did not outweigh GCR's "non-price advantages in the remaining factors or merit the $2,263,020.19 price premium." (*Id.*).

In response, Ginn Group protested the contract award with the Government Accountability Office ("GAO"). The foundation of Ginn Group's protest before the GAO was substantially similar to its arguments before the Court: that the Agency conducted discussions that were not meaningful, that the Agency misevaluated the strengths and weaknesses of Ginn Group and GCR's proposals, and that as a result, the Navy's ultimate best-value decision was unreasonable. (AR 8397). The GAO found no support for the arguments and found the Navy's determination to be reasonable. (*Id.*).

## II. Analysis

Ginn Group challenges the Navy's contract award on four grounds. First, Ginn Group contends that the Agency's evaluation of GCR's proposal lacked rational basis because the Agency did not downgrade or find GCR's proposal unacceptable for its low staffing level and for a technical approach to recycling services that Ginn Group views as inadequate. (Pl.'s MJAR at 4–10, ECF No. 33). Second, Ginn Group argues that the Navy's evaluation of Ginn Group's offer lacked a rational basis because the Navy did not assign Ginn Group a strength for its technical approach to recycling services. (*Id*.). Third, that the Agency failed to conduct meaningful discussions with Ginn Group that would have helped Ginn Group modify its technical approach in the ISWM performance area. (*Id*.). And fourth, that because of the conglomeration of these errors the Agency's ultimate best-value decision in this case lacked a rational basis, as it did not follow a fair and reasonable assessment of each proposal's strengths and weaknesses. (*Id*.)

The Court reviews an agency's action to determine if it was "arbitrary, capricious, an abuse of discretion,"—in other words, lacked a rational basis—or if the agency's action was not "in accordance with law"—in other words, it involved a violation of regulation or procedure. 28 U.S.C. § 1491(b)(4); *Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1358 (Fed. Cir. 2015). In reviewing whether the Agency's decision lacked a rational basis, the Court seeks to find if "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F. 3d 1324, 1333 (Fed. Cir. 2001) (quoting *Latecoere Int'l, Inc. v. Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)); *PAI Corp. v. United States*, 614 F.3d 1347, 1352 (Fed. Cir. 2010) ("To demonstrate that [the agency's procurement decision was] arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion of an actual or apparent [violation] is not enough." (quoting *C.A.C.I., Inc.-Fed. v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983)). This standard is highly deferential. *Advanced Data Concepts, Inc., v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).

Even under this highly deferential standard, the Court will set aside an agency action when the agency "'entirely fail[ed] to consider an important aspect of the problem, offer[ed] an explanation for its decision that runs counter to the evidence before the agency," or when the decision "is so implausible that it cannot not be ascribed to a difference in view or the product of agency expertise.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43, (1983)). However, this highly deferential standard means that "a court is not to substitute its judgment for that of the agency." *Id.* Therefore, if the agency's actions show rational reasoning and consideration of relevant factors, the Court is required to sustain the decision. *Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc. v. Ark. Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)). "Greater yet," is the deference to the procurement official's discretion in awarding a contract "on the basis of a best-value determination," which often involves balancing price and non-price factors. *Linc Gov't Serv.s, LLC v. United States*, 96 Fed. Cl. 672, 706 (2010). This deferential standard is even further heightened in the context of negotiated procurements, where the agency officials must engage in an "inherently[] judgmental process," *Burroughs Corp. v. United States*, 223 Ct. Cl. 53 (1980), and are therefore entrusted with "especially great discretion, extending even to [their] application of procurement regulations," *Am. Tel. & Tel. Co. v. United States*, 307 F.3d 1374, 1379 (Fed. Cir. 2002).

More relevant to the exact procurement in this case, reviewing the agency's technical evaluations is subject to another separate level of deference, as it falls within a special category of "discretionary determinations" that the Court "will not second guess." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). Therefore, for the protester to prevail, it must show that "the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from" those in the other proposals. *Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (*citing Enhanced Veterans Solutions, Inc. v. United States*, 131 Fed. Cl. 565, 588 (2017)). Hence, protesters challenging the agency's technical evaluation in the context of negotiated, best-value procurements must overcome a "triple whammy of deference." *Gulf Group, Inc. v. United States*, 61 Fed. Cl. 338, 351 (2004).

Should the Court find that the Agency's conduct failed under this standard of review, it must then decide if the "bid protester was prejudiced by that conduct." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005). The protester can establish prejudice by showing "that there was a 'substantial chance' it would have received the contract award but for the [agency's] errors." *Id.* at 1353.

*A. The Agency's evaluation of Ginn Group's and GCR's recycling proposals did not lack a rational basis.*

Ginn Group argues that the Agency's evaluation of its and GCR's recycling proposals lacked a rational basis. (Pl.'s MJAR at 10–13). Ginn Group specifically argues that GCR's technical approach to recycling services should have resulted in either a downgrade or an "Unacceptable" rating. (*Id.*). Ginn Group also argues that the Agency should have assigned a strength to Ginn Group's technical approach to recycling. (*Id.* at 17). Neither the plain meaning of the terms of the solicitation nor the context or structure of the RFP support Ginn Group's arguments.

Ginn Group highlights what it sees as the significant difference between the two technical approaches to recycling: Ginn Group proposed to "establish recycling services at NSA Panama City for white paper and aluminum cans" whereas GCR's proposal did not provide the Agency with that option. (*Id.* at 11). Ginn Group argues that the Agency's final evaluation of GCR's proposal did not reflect this shortcoming in comparison to Ginn Group's offer.

The Agency is required to evaluate all offers according to the terms and conditions of the RFP. *See* FAR § 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation."); *see also Dubinsky v. United States*, 43 Fed. Cl. 243, 267 n.56 (1999) (finding that evaluation of proposals must adhere to the rating system articulated in the RFP). Therefore, the question of what consideration should have been given to the absence of white paper and aluminum can recycling in GCR's proposal must be answered by referencing the exact terms of the RFP.

Importantly, recycling services was not a distinct sub-annex in the solicitation. (AR 27 (listing the sub-annexes of services requested)). The terms of the solicitation categorized the Base Operation Services sought under the contract within the following sub-annexes: Facility Management, Facility Investment, Custodial, Pest Control, Other (Swimming Pools), Grounds

Maintenance and Landscaping, Pavement Clearance, Environmental, and Integrated Solid Waste Management (ISWM). (*Id.*). Recycling services only constituted a subtask under one out of the six sub-annexes previously mentioned. (AR 301).

The PWS provided a more detailed explanation of the subset of services required under each sub-annex mentioned in the RFP. (AR 188–301). The PWS section pertaining to the ISWM sub-annex established that the overall requirement for the contractor under this sub-annex was to "provide refuse collection, disposal and recycling services to ensure refuse and recyclables are properly collected and disposed." (AR 301). Indeed, many of the performance objectives or subtasks listed in the PWS for this sub-annex did not relate to recycling. Under Spec Item 3.2.1., for example, the contractor was required to "dispose of non-recyclable solid waste," and, under Spec Item 3.3, the contractor was required to "maintain vehicles and equipment in a manner to ensure a clean appearance, minimal foul odors, and normal working conditions." (AR 303). One subtask in the PWS under the ISWM sub-annex involved Solid Waste Collection. (AR 301). For Solid Waste Collection, the PWS required that contractor "provide collection of residential, commercial, and industrial solid wastes to ensure refuse and recyclables are properly collected." (AR 301). The RFP language that influenced Ginn Group to include white paper and cans recycling in its proposal appears in part of the subsection titled "Related Information" for this subtask in the PWS: "The Contractor shall use Materials Recovery Facility (MRF) or a Single Stream Recycling Facility to the fullest extent possible." (AR 301). Ginn Group argues that this language "gave bidders strong reason to think" that expanding recycling services would be counted as a strength and or any shortcomings counted as a deficiency. (Pl.'s MJAR at 13).

Despite Ginn Group's reliance on one excerpt of the PWS, the RFP must be considered as a whole. *See Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004) ("[W]e must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions." (citing *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003))). There is no clear instruction in the RFP that any additional recycling service, in isolation, merited a strength rating or that its absence should render a proposal "Unacceptable," as Ginn Group claims. (Pl.'s MJAR at 7). Instead, clear instructions in the RFP provided that every aspect of any technical approach would be analyzed within the context of its impact across "all other technical specification simultaneously," and with the view on how that specific technical approach would be "advantageous to the Government." (AR 50–51; *see also* AR 43 (defining strength as technical approach that "exceed[]" specified performance or capability requirements "in a way that will be advantageous to the Government during contract performance.")).

Furthermore, because the RFP should be interpreted "as a whole," the relative weight of the excerpt Ginn Group relies on cannot be assessed without reference to the context of the whole solicitation. *Linc Gov't Servs., LLC*, 96 Fed. at 672; *see also Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 752 (Fed. Cir. 1999). The United States correctly asserts that recycling service was not a separate factor in the RFP but appeared only as one segment of one sub-annex in the RFP. (Def.'s xMJAR 36). Given this structure, the Agency's decision to evaluate Ginn Group's technical approach to a subset of the proposal in the context of its overall advantage to the Government, rather than in isolation, was in line with the evaluation criteria in the RFP. *See e.g., Rotech Healthcare, Inc. v. United States*, 121 Fed. Cl. 387, 397 (2015) (finding that a bidder's "transition plan" was less important than the many other substantive aspects of the

bidders' proposals' when that factor constituted "only one of five subfactors in the Technical factor, which in turn [was] only one of the three factors that the RFP required the agency to consider and evaluate"); *Quanterion Sols., Inc. v. United States*, 152 Fed. Cl. 434, 441–43 (2021) (finding that an "isolated sentence" in the RFP cannot render performance of Information Analysis Center services a requirement, when "the majority of the verbiage in the RFP" focused on other factors.). Given the context and the broader structure of the RFP, the Court's second-guessing of the Agency's evaluation of only a part of an offeror's approach to a subpart of a subpart of the proposal would be akin to delving into the "minutiae of the procurement process," a practice that the Court has long avoided. *E.W. Bliss Co.*, 77 F.3d at 449 (finding that bid protest challenges "deal[ing] with the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess"); *Commc'n Constr. Servs., Inc. v. United States*, 116 Fed. Cl. 233, 266 (2014) ("As the Federal Circuit has recognized, challenges to the technical scoring involve the minutiae of the procurement process, discretionary determinations that a court will not second guess.") (internal citations and quotation marks omitted). The Court's assessment of the overall structure of the RFP indicates that the Agency's evaluation of GCR's and Ginn Group's technical approaches to recycling was reasonable.

For its part, Ginn Group claims that its decision to include white paper and aluminum can recycling in its proposal was influenced by the particular terms of the RFP. (Pl.'s MJAR at 6). Specifically, Ginn Group points the Court to language in the RFP that stated: "The Contractor shall use Materials Recovery Facility (MRF) or a Single Stream Recycling Facility to *the fullest extent possible*." (AR 1838 (emphasis added)). Ginn Group claims that it took this "statement[] about recycling to heart and proposed a substantial expansion of recycling activities." (Compl. at 2). Ginn Group claims that through its own research of available recycling services at the Navy facility in Panama City, Ginn Group discovered that recycling for white paper and cans was available and therefore included that in its proposal. (Pl.'s MJAR at 11). The United States disagrees that this language meant that the Navy sought recycling services to the maximum extent possible. (Def.'s xMJAR at 38).

The dispute between the parties based upon their disparate interpretations of the solicitation poses a question of law that the Court reviews de novo. *CBY Design Builders v. United States*, 105 Fed. Cl. 303, 327 (2012) (citing *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004)). Well-established principles of contract interpretation apply to the interpretation of government solicitations. *Linc Gov't Servs., LLC*, 96 Fed. Cl. at 708. This requires that the Court begin its analysis with an independent review of the plain language of an agency's solicitation. *Id*. Ginn Group asserts that the Solicitation terms advising offerors to "use Materials Recovery Facility (MRF) or a Single Stream Recycling Facility to *the fullest extent possible*," imposed an effective requirement on all offerors to provide those services to the maximum. (Pl.'s MJAR at 6). Although this is a plausible reading of the text, it is by no means the only one. It is a cardinal principle of construction of contracts to interpret phrases in a way that every word is given its effect. *AMP, Inc. v. United States*, 182 Ct. Cl. 86 (1968). In line with that principle, it is difficult to imagine why the terms of the Solicitation would qualify the phrase "to the fullest extent" with the phrase "possible" if the Agency's goal, as Ginn Group claims, was simply to request the absolute maximum of those services without any conditions. In other words, a command to the offerors to "use Materials Recovery Facility (MRF) or a Single Stream

Recycling Facility to *the fullest extent*," would have simply carried that message with unmistakable clarity and without the need for the qualifier "possible."

Ginn Group argues that the "ordinary" meaning of "to the fullest extent possible," suggests that the Navy would have been willing to "pay a little more" for additional services and that failure to provide all the services available would have been "viewed negatively." (Pl.'s MJAR at 6). Ginn Group is correct that the phrase "to the fullest" certainly connotes emphasis and not limitation. Yet the language used by the Navy cannot be read to require recycling services to the exact absolute outer boundaries because the language is qualified by the word "possible." The Oxford dictionary defines "possible" as that which "is capable of being; that may or can exist, be done, or happen (in general, *or in given or assumed conditions or circumstances*)." *See* Oxford English Dictionary Online, https://www.oed.com/view/Entry/148376?redirectedFrom=possible#eid (last visited Apr. 13, 2022)). The dictionary definitions of the word possible therefore evade absolutes and instead connote conditions. *See also Johnson v. State*, 366 S.W.3d 11 (Mo. Banc. 2012) (finding that the word possible is most commonly used to evoke deviations from what would otherwise be "the absolute degree" and specially to signal a need for "consideration of other recognized factors"); *Rhoades v. State*, 848 N.W.2d 22, 26–28 (Iowa 2014) (collecting cases finding the word possible to mean contingent on circumstances). Therefore, the phrase "to the fullest extent possible," cannot be read to command compliance to the utmost degree and with no exceptions; instead, it means that minor and reasonable deviations from the requirement were anticipated. The Court then has to look at the context of the RFP to assess what those anticipated conditions are.

It is evident from the terms and the structure of the RFP that price was one limiting condition. The clear terms of the RFP notified all offerors that when combined, all non-price factors (including technical approach) were "approximately equal" in importance to price. (AR 46–47). Therefore, although the Agency's edict that offerors "shall use Materials Recovery Facility (MRF) or a Single Stream Recycling Facility to the fullest extent possible," meant that offerors should have given those sub-services comprehensive and objective treatment, it did not mean that the Agency required absolute perfection in that area at any cost. Therefore, the Court finds that the most reasonable reading of the phrase "to the fullest extent possible," is to require recycling services subject to and consistent with other essential considerations of the proposal, namely cost and price.

As the United States contends, Ginn Group failed to articulate how its proposed recycling approach fits within the balance of other equally important elements of the RFP including "cost savings." (AR 8335). Although Ginn Group claims that it "was not required to articulate a reason why the Agency wanted recycling to the fullest extent possible," this statement reflects a misunderstanding of the RFP's requirements. (Pl.'s MJAR at 6). The terms of the RFP required that the offerors describe in detail how their technical approach would benefit the Government. Ginn Group did not. For this procurement, the Agency's evaluation standard involved reviewing each offeror's technical approach for adequate staffing *overall* and for each sub-annex. (AR 142). The offerors were instructed to provide a narrative that explained not only "how the proposed approach and labor hours will effectively achieve each performance objective," and "each technical specification," but importantly, how that approach would translate "across all technical specification simultaneously." (AR 51). In line with that goal, the RFP evaluation criteria did not simply assign strengths to any aspect of the proposal that might exceed the

Government's expectations; instead, evaluators were instructed to assign strength to an aspect "of an offeror's proposal that has merit or exceeds specified performance or capability requirement *in a way that will be advantageous to the Government* during contract performance." (AR 4632 (emphasis added)). Although Ginn Group claims that the Agency should have given Ginn Group a strength for "going above and beyond" in its proposed staffing for recycling services, there is no evidence that Ginn Group ever informed the Agency how this approach would work across all other technical specification to make the proposal more advantageous to the Agency. (AR 55). Therefore, the Agency's decision to not assign Ginn Group a strength merely for proposing additional recycling services was a reasonable decision supported by the record. *See L-3 Commc'ns EOTech, Inc. v. United States*, 83 Fed. Cl. 643, 650 (2008) ("The deference afforded to an agency's decision must be even greater when a trial court is asked to review a technical evaluation.").

*B. The Agency's evaluation of GCR's and Ginn Group's proposed staffing levels did not lack a rational basis.*

Ginn Group argues that the Agency's evaluation of GCR's and Ginn Group's staffing levels lacked a rational basis because the Agency's award does not account for the fact that GCR proposed "the most thinly staffed workforce of all bidders." (Pl.'s MJAR at 8). Ginn Group's staffing argument focuses on GCR's staffing levels in two performance areas: Facility Management and Custodial. Particularly, the Agency's final evaluation found GCR's proposed staffing to be ■■■■% less than the Government anticipated labor hours in the Facility Management sub-annex and ■■■■% less in the Custodial sub-annex. (AR 8053). The Agency claims that its final determination that both proposed hours were adequate is supported by the methodology outlined in the Technical Team Report and the terms of the RFP. (Def.'s xMJAR at 41–45).

The Navy's method for evaluating the adequacy of labor hours, as applied by the Technical Team, distinguished between understaffing in critical and non-critical sub-annexes. Unlike other sub-annexes, Facility Management was not defined as a critical sub-annex under Factor 1 (Corporate Experience). (AR 140–141, 626–627). The Technical Team's approach was to only give "[c]onsideration for weaknesses, significant weaknesses or deficiencies . . . if an offeror's proposed labor hours for a [non-critical Sub-Annex] were less than minus 25% of the labor hours anticipated by the Government [] *or* if the difference in labor hours was nominal." (AR 5841 (emphasis added)).

This approach meant that for some proposed labor hours that would have otherwise resulted in a downgraded assessment (those in non-critical sub-annexes or those found to be nominal), the Agency was going to review the labor hours on a more comprehensive level. (*See e.g.*, AR 8036 (finding the difference of approximately ■ FTE to be nominal in light of the "potential efficiencies" of the offerors' "proven Predictive Maintenance Program.")). The RFP stated as much in other parts as well: "[t]he Government will evaluate how well the offeror's approach demonstrates *adequate* labor hours on an overall level, as well as for each technical specification (and each specification item) supported by a reasonable [Basis of Estimate], and demonstrates a reasonable understanding of the requirements and labor quantities and skills needed to successfully perform." (AR 628 (emphasis added)). Given this language and a technical evaluation methodology that gave the Agency the discretion to forgo downgrading for

certain labor differences that the Agency viewed as "nominal," the Agency made the reasonable decision to assess certain proposed labor hours in a broader context.

For example, although GCR's proposed staffing was [redacted]% less than the Government anticipated labor hours for the Facility Management sub-annex, the Agency found this difference to be nominal. (AR 8053). Instead, the Agency decided to view this staffing level in the context of GCR's past experience operating at that level and found the risk associated with the proposed hours to be low. (*Id.*).

The Agency applied this flexible approach consistently to other offerors' proposals as well. (*See e.g.*, AR 8076, finding labor hours that were [redacted]% and [redacted]% below the Government's estimates to present nominal differences in the context of the offeror's staffing levels in other areas and the low risk to the Government). In fact, even Ginn Group's own proposal received this comprehensive analysis from the Technical Team. (*See* AR 8068 (finding Ginn Group's low labor estimates for overall Spec Items 1 and 2 as "nominal" because of the low risk it represents.)). The Agency's exercise of its judgment to treat certain low levels of understaffing as nominal was also in line with the terms of the RFP which stated that labor hours "*may* be evaluated less favorably or considered unacceptable," if they were not accompanied by a logical explanation. (AR 628 (emphasis added)). This language allowed the Agency to also exercise its own independent judgment in evaluating certain staffing levels.

Ginn Group also challenges the Agency's decision to revise its internal estimate for staffing in these two areas and labels the Agency's failure to explain that decision as "inherently suspicious and irrational." (Pl.'s MJAR at 15).[6] Ginn Group does not support that statement with any caselaw establishing a requirement that agencies provide an explanation of every change in the Government estimate. In particular, Ginn's contention is impossible to reconcile with past cases which have found that agencies may at times even rely on fully undisclosed Government estimates. *SP Sys. v. United States*, 86 Fed. Cl. 1 (2009); *SDS Int'l v. United States*, 48 Fed. Cl. 742, 758 (2001). The test for the Court instead has been to ensure that the agency does not mechanically rely on an estimate that it has found to be inadequate; and that the agency's reliance on its estimate does not prejudice any offerors whose offers significantly differ from the estimate relied on. *SP Sys.*, 86 Fed. Cl. at 18. Although Ginn Group emphasizes the fact that the Agency revised its internal staffing estimates downward, reducing the size of GCR's deviation from the estimate from close to [redacted]% to only [redacted]%, this adjustment also clearly benefited Ginn Group and other offerors. Although Ginn Group's proposed hours under Facility Management were originally [redacted]% lower than anticipated by the Government, Ginn Group's final proposed hours for that sub-annex were only [redacted]% less than the Government revised anticipated total. (AR 8068).

---

[6] GCR originally underbid the staffing for Facility Management sub-annex by about [redacted] (offering [redacted] labor hours against the Agency's [redacted] expected labor hours). (AR 5863). Subsequent to the Agency's revision of its internal estimate, GCR was understaffed by approximately [redacted]% (having offered [redacted] labor hours against the Agency's [redacted] expected labor hours). (AR 8094).

Ginn Group's claim that "the Agency did not assign even a single weakness to GCR's proposal relating to this staffing shortage," is a conclusory statement unsupported by the provisions of the RFP. The terms of the RFP indicated that staffing levels would be reviewed with an eye towards assessing whether each offeror had "a reasonable understanding of the requirements and labor quantities and skills needed to successfully perform." (AR 51). To this end, the Agency used the methodology outlined in the Technical Team's report in conjunction with the information available regarding offerors' past experience. (AR 8102). *URS Federal Services Inc. v. United States*, 142 Fed. Cl. 392 (2019) (finding that when the Solicitation does not prescribe a particular method for analyzing the offerors' understanding of the technical requirements the greatest deference possible should be given to special expertise of procurement officials); *Telos Corp. v. United States*, 129 Fed. Cl. 573, 578 (2016) (finding that the FAR does not require a documented explanation of "why the staffing [proposed by an offeror] was found adequate for each task to be performed under the contract."). GCR informed the Agency that, despite its lower proposed labor hours in certain areas, it had implemented the same management system in other similar projects. (AR 7198). The Agency found that GCR's experience with similar projects justified certain degree of deviation from the estimate in labor hours. (AR 7198). As the Court has previously found, agencies are the best judge of relevance of past performance, and the Agency decision here adequately documented the reasoning. (*Id*. ("GCR also benchmarked its custodial labor hours against several current NAVFAC SE contracts including custodial requirements (NCBC Gulfport, MS; NSB Kings Bay, GA, and MCSF Blount Island, FL)")); *see Glenn Defense Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 911 (Fed. Cir. 2013); *Appsential, LLC v. United States*, 153 Fed. Cl. 610 (2021).

Ginn Group asserts that the Agency failed to substantiate the relevance of GCR's experience or establish that it was done without "a detrimental effect on those other customers," (Pl.'s Reply at 9, ECF No. 38), but that is not the standard governing Agency evaluation of labor hours. GCR had informed the Agency that it intended to "implement the same management systems and processes that have historically proven successful" for GCR at NSA Panama City, and under its current contract that involved custodial services. (AR 11337). GCR provided the Agency with the details of its past performance, (AR 11318; *see also* 11408–25 (GCR's contractor performance assessment report)), and the Agency emphasized the importance of GCR's past experience in a number of instances. (*See e.g.*, AR 8122). Therefore, the record includes sufficient documentation supporting the Agency's determination that GCR's Custodial staffing hours were adequate. *See Telos Corp.*, 129 Fed. Cl. at 578 (the FAR does not require a documented explanation of "why the staffing [proposed by an offeror] was found adequate for each task to be performed under the contract."); *Synaptek, Inc. v. United States*, 141 Fed. Cl. 443, 453 (2018) (awardee made representations in its proposal on which the agency was entitled to rely); *see also Survival Sys., USA, Inc. v. United States*, 102 Fed. Cl. 255, 264 (2011). In sum, the Agency's evaluation of GCR's Custodial labor hours is not "so implausible that it could not be ascribed to a difference in view or the product of agency expertise," and therefore, does not lack rational basis. *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43.

Finally, Ginn Group points to what it describes as the Agency's reoccurring mathematical error in discussing GCRs staffing levels. Ginn Group points the Court to two instances in which the Agency claimed that GCR's staffing levels for Facility Management were "less than ■ FTE lower, than anticipated by the Government," where the correct phrasing would instead have been "more than" ■ FTE. (Pl.'s MJAR at 15). Ginn Group frames these errors as the Agency's

attempt to "cover" for GCR's staffing levels and carried out in an "effort to award to GCR." (Pl.'s MJAR at 9). Ginn Group fails to substantiate how the Agency's incorrect statements would have undermined the rationality of the award decision. *Quanterion Solutions, Inc.*, 152 Fed. Cl. at 22 (a minor mathematical error in the IGE by itself does not impair the rationality of an award decision). Regardless of whether the approximately ████ hours difference amounts to less than or above ██████ FTE, the Agency found the raw difference between GCR's labor hours and its estimate to be nominal because of the context of GCR's relevant experience with conducting similar projects at the same staffing level. (AR 8123). The Agency's underlying reasoning for viewing this staffing difference as nominal is satisfactory.

To the extent that the Agency may have erred in describing the approximate size of this relatively small deviation, such errors have typically been categorized as de minimis errors.[7] *See Andersen Consulting v. United States*, 959 F.2d 929, 935 (Fed. Cir. 1992) ("De minimis errors are those that are so insignificant when considered against the solicitation as a whole that they can safely be ignored and the main purposes of the contemplated contract will not be affected if they are."). The Court has persistently held that overturning awards based on de minimis errors is unadvisable. *See e.g.*, *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996). As the Court has previously noted, even "violations of law," let alone innocuous mistakes, should not result in setting aside awards unless those mistakes have some significance, for "[a]ny good lawyer can pick lint off any Government procurement." *Andersen Consulting*, 959 F.2d at 932.[8]

*C. The Agency did not fail in conducting meaningful discussions with Ginn Group.*

Ginn Group also argues that the Agency failed to conduct meaningful discussions as required by FAR 15.306. Ginn Group claims that the SSA was obligated to address what Ginn Group characterizes "as a vast difference between" the two staffing levels and/or to inform Ginn Group that the Agency did not seek recycling to the fullest extent possible.

When the agencies conduct discussions, those discussions must be "meaningful" and not misleading. *CRAssociates, Inc. v. United States*, 102 Fed. Cl. 698, 715 (2011). During discussions, the Agency is required to identify "deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond." FAR § 15.306(d)(3). The Court has recognized that "practical considerations" limit the agency's power to discuss every aspect of every offeror's proposal and that discussions often therefore

[7] Unlike motions for summary judgment, existence of genuine issues of material fact does not preclude judgment on the administrative record. *See Fort Carson Supp. Servs. v. United States*, 71 Fed. Cl. 571, 585 (2006). When the administrative record forms the Court's "focal point for judicial review," *Camp v. Pitts*, 411 U.S. 138, 142 (1973), the Court will review both disputed and undisputed facts in that record to decide if the Agency complied with the legal standards governing the decision under review. *See Greene v. United States*, 65 Fed. Cl. 375, 382 (2005).

[8] To the extent that the Agency may have made a mistake in reciting the results of its mathematical calculations, Ginn Group has conceded its claim does not constitute a bad faith challenge. (Pl.'s Resp. at 9, ECF No. 38).

focus on parts of the "proposals requiring amplification or correction." *Advanced Data Concepts, Inc.*, at 422. To that end, "[t]he scope and extent of discussions are a matter of [a] contracting officer[’s] judgment." FAR § 15.306(d)(3). A discussion is misleading when the agency "misdirect[s] the protestor as it revises its proposal." *DMS All-Star Joint Venture v. United States*, 90 Fed. Cl. 653, 670 (2010) (collecting cases).

"The contracting officer is not required to discuss every area where the proposal could be improved." FAR § 15.306(d)(3). There is no evidence in the record that the Agency found Ginn Group’s technical approach to recycling or its related staffing levels to be so unreasonable to make it unacceptable for contract award. *DMS All-Star Joint Venture*, 90 Fed. Cl. at 669 ("[I]f an offeror’s costs are not so high as to be unreasonable and unacceptable for contract award, the agency may conduct meaningful discussions without raising the issue of the offeror’s costs."); (*see* AR 8339 ("Both the Ginn Group and GCR provided an acceptable organizational chart, BOE, and approach to recycling.")). As Ginn Group avers, neither its proposed staffing levels nor its technical approach to recycling were burdened by any inherent deficiencies or unacceptable weaknesses; the fact that the same aspects of the proposal *may* be viewed as *relative* weaknesses only when compared against other equally acceptable offers does not create an obligation for the Agency to discuss them with the offeror. *CRAssociates*, 102 Fed. Cl. at 715 (finding that the agencies need not "discuss every aspect of [a] proposal that receives less than the maximum score," neither do they need to "identify relative weaknesses in a proposal that [are] technically acceptable but present[] a less desirable approach than others."); (*see also* AR 8122 (finding "[a]ll offerors proposed adequate staffing and no weaknesses, significant weaknesses or deficiencies were identified in any of the four offeror’s FPRs for Factor 2.")).

In this case, both offerors were given adequate information to ensure that they bid even-handedly. They were both given the option to either "review and confirm, or revise," their approach in areas that the Agency found lacking. (AR 6307, 6408). The agency did not take any concrete actions during the discussions to put Ginn Group under the impression that it should not revise its staffing level or change its recycling proposal and its mere inaction with regards to those areas cannot constitute misleading discussion. *DMS All-Star Joint Venture*, 90 Fed. Cl. at 671 (holding that the agency did not mislead the offeror when it identified one price concern related to the offeror’s proposal, but not other concerns regarding labor salaries and non-labor costs, because the agency did nothing to suggest that the offeror "should not consider lowering certain cost elements"); *CSC Gov’t Sols. LLC v. United States*, 129 Fed. Cl. 416, 439–40 (2016) (finding that discussions are not coercive where the record demonstrates that an offeror retained the option to make any adjustment to its proposal).

When two or more offerors’ proposals differ in meaningful ways that reflect each offeror’s distinct approach to the project, so long as both approaches are adequate, the Agency has every right to preserve its options and make the best-value determination with the comparative advantages of each proposal before it. Ginn Group’s insistence that the Agency needed to homogenize the two offers before reaching its final determination misconstrues the Agency’s obligations in conducting meaningful discussions, especially in the context of best-value procurement. The Navy’s discussions with the offerors were not arbitrary, capricious, an abuse of discretion, or otherwise contrary to applicable law or regulation.

*D. The Agency's best-value determination did not lack a rational basis.*

Finally, Ginn Group asserts that the Agency's best-value determination lacked rational basis as it did not "fairly and reasonably reflect proposal strengths and weaknesses with respect to recycling and staffing." (Pl.'s MJAR at 10). As discussed previously, the Court finds that Ginn Group has not met its burden to prove that the Agency's assessment of the offerors' recycling proposals or staffing levels lacked a rational basis. For that reason, those assertions do not support Ginn Group's argument that the best-value determination lacked a rational basis.

To challenge a best-value determination the protester must offer more than mere disagreements with the Agency's overall assessment of the adequacy of different proposals. *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 384 (2003). Ginn Group has not shown that the agency entirely failed "to consider an important aspect" of the best-value tradeoff, nor has it shown that the explanation provided by the Agency ran "counter to the evidence" before it. *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43). The Agency adequately documented its analysis throughout the solicitation period, highlighted the exact differences between Ginn Group and GCR's proposals as well as the price/technical tradeoffs they presented, and included a narrative rationale for the business judgments and the tradeoff adopted in reaching the final decision. *See Blackwater Lodge & Training Center, Inc. v. United States*, 86 Fed. Cl. 488, 514 (2009) (finding that the best-value determination was not arbitrary and capricious when the agency's "business judgment" as to why certain strengths did not warrant a price premium were documented and recorded). The fact that Ginn Group has not informed the Court of any significant differences between its proposal and GCR's that are not already apparent from the Agency's own documentation of its comparative decision attests to the fact that the Agency did not overlook any significant factors. (AR 8338–40); *see, e.g., FirstLine Transportation Security, Inc. v. United States*, 100 Fed. Cl. 359, 368 (2011) (finding that the agency's best-value determination lacked rational basis when the agency failed to provide a coherent account of why it awarded the contract to an inferior lower-priced offeror that had one technical strength and one weakness, while the protestor had 33 strengths and no weaknesses). Even when the best-value procurement criteria elevates importance of technical factors above price, which it does not in this case, an agency's determination to select a technically-lower-rated but lower-priced proposal remains within the bounds of rational decision making so long as it is supported by the record. *See Mil-Mar Century Corp. v. United States*, 111 Fed. Cl. 508, 553 (2013). Here, the evaluation criteria already elevated price above technical factors and the Agency ultimately determined that the lower-priced proposal was more advantageous to the Government. (*See* AR 8121–22; 46–47; 8338 (stating that all technical factors and past performance rating, when combined were approximately equal to price)). The SSA's determination reflects an independent analysis of the record before the Agency and contains an adequate comparison of the proposals against the evaluation criteria and other proposals.

Although Ginn Group claims that the Agency "failed to consider Ginn Group's plan to expand recycling in its evaluation of the Ginn Group proposal or its best-value tradeoff decision," the Agency was not required to provide an in-depth critical analysis of a technical approach that it found adequate just because it was different than the awardee's approach. (*See* AR 8339 ("Both the Ginn Group and GCR provided an acceptable organizational chart, BOE, and approach to recycling.")). As the Court has stated, "when an agency is not finding fault with

a particular approach to a task, or noting its superior quality, the Court cannot see how the agency should be required to explain its finding—that the approach is merely adequate—in any detail." *InSpace 21 LLC. v. United States*, 128 Fed. Cl. 69, 89 (2016). No statutory or regulatory authority requires in-depth documentation and discussion of every technical approach that the agency finds adequate, and the Court has been wary of imposing on the agencies the high transactions costs associated with including such lengthy discussions in the best-value determination. *Id*. Instead, the Court has reiterated that protesters cannot unilaterally impose upon an agency the duty to explain why any feature in their proposal "was not found to be a strength, merely by disputing this determination." *Telos Corp.*, 129 Fed. Cl. at 577. Ginn Group's argument that the Agency needed to discuss the "vast difference" in staffing levels as a part of its best-value determination is unavailing for the same reason. The Source Selection Decision noted that "[a]ll offerors proposed adequate staffing and no weaknesses, significant weaknesses or deficiencies were identified in any of the four offeror's FPRs for Factor 2." (AR 8122). The notion that when an agency finds aspects of a protester's proposal to be adequate, and thus not material to the best-value determination, each adequacy determination must nevertheless be explained for the award decision to be rational, "has no basis in law or reason." *Telos Corp.*, at 577.

Reviewing the administrative record establishes that, by all indications, both GCR and Ginn Group provided the Agency with acceptable proposals which presented their own costs and benefits. The *best* in the best-value determination naturally connotes the existence of perhaps many good, maybe some better, but only one best proposal. The agency that has the power to pick the best value is incentivized at every stage to improve all offers so that it is ideally faced with a plethora of diverse but equally good approaches to implementing the project. Therefore, at the final stage of a best-value procurement, it is the agency's challenging task, and not the Court's, to decide which offer is more desirable to the Government among the many potentially good options. *Tiber Creek Consulting, Inc. v. United States*, 129 Fed. Cl. 409, 415–16 (2016) ("[A] best-value determination requires a series of judgment calls," and "is very difficult to overturn, particularly when the [deciding official] gives supporting rationale for their decision[.]").

Disappointed offerors understandably lament the marginal differences that shape the agencies' final determinations. However, the Court cannot substitute its own judgment for that of an agency without disincentivizing the agency from optimizing its portfolio of options and from establishing a record that highlights other offerors' strengths. The Court's persistent reference to best-value determinations as ones "necessarily" entailing "a subjective process" reflects this understanding. *One Largo Metro, LLC v. United States*, 109 Fed. Cl. 39, 96 (2013).

Ginn Group made the reasonable business judgment to offer the Agency the option to expand one subpart of the services required under the contract, recycling services, at an additional price. The agency found this offer overall acceptable and assessed its strengths and weaknesses against an offer from another offeror that had more relevant past experience and offered a lower price. The Agency found the latter option more desirable and advantageous for the particular needs of the Government. The Court's highly deferential standard towards agencies' assessment of technical differentials, making best-value determinations, and conducting negotiated procurements, only requires that the Agency documents a rational connection between the facts before it and the choice it made. *Motor Vehicle Mfrs. Ass'n.*, 463

U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). The Agency has adequately met that burden in this case.

Ginn Group also seeks as relief a permanent injunction barring the Agency from proceeding with an award to GCR. (Pl.'s MJAR at 20–23). For the Court to grant injunctive relief, the plaintiff must succeed on the merits of the case. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004) (discussing the four-part test for injunctive relief, including a determination of whether "the plaintiff has succeeded on the merits of the case"). Ginn Group has not succeeded on the merits, so the Court is unable to award injunctive relief and need not address the remaining factors for injunctive relief. *Int'l Res. Recovery, Inc. v. United States*, 64 Fed. Cl. 150, 164 (2005) ("A plaintiff that cannot show that it will actually succeed on the merits of its claim cannot prevail on its motion for injunctive relief."); *Argencord Mach. & Equip., Inc. v. United States*, 68 Fed. Cl. 167, 176 (2005).

## III. Conclusion

Accordingly, the Court **DENIES** Ginn Group's Motion for Judgment on the Administrative Record, (ECF No. 33), and **GRANTS** the United States' and the Government Contracting Resources, Inc.'s Cross-Motions for Judgment on the Administrative Record. (ECF Nos. 36, 37).

The parties shall meet and confer and file a joint status report proposing redactions to the memorandum opinion by **April 29, 2022,** to allow the Court to file a public version of the opinion.

The Clerk is **DIRECTED** to enter judgment for the defendants.

**IT IS SO ORDERED.**

s/ David A. Tapp
DAVID A. TAPP, Judge